<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| CARLIA BRADY<br><br>        Plaintiff,<br><br>v.<br><br>TOWNSHIP OF WOODBRIDGE, *et al.*,<br><br>        Defendants. | Civil Action No. 19-17868 (SDW) (LDW)<br><br>**OPINION**<br><br>December 15, 2025 |

**WIGENTON**, District Judge.

Before this Court are Defendants Township of Woodbridge, Director Robert Hubner, Lieutenant Brian Murphy, Detective Sean Grogan, Sergeant Walter Bukowski, and Lieutenant James Mullarney's (collectively, "Defendants") Motions for Summary Judgment (D.E. 239–242) pursuant to Federal Rule of Civil Procedure ("Rule") 56. Jurisdiction is proper pursuant to 28 U.S.C. § 1331. This opinion is issued without oral argument pursuant to Rule 78. Having considered all the submissions filed in connection with these Motions, this Court makes the following determinations.

## I.    <u>FACTUAL BACKGROUND[1]</u>

---

[1] Facts cited in this opinion are drawn primarily from Defendants' Statement of Undisputed Material Facts (D.E. 239-1 ("Defs' Statement")); Plaintiff's Counterstatement of Undisputed Material Facts (D.E. 253-1 ("Pl.'s Counterstatement")); Plaintiff's Response to Defendants' Statement of Undisputed Material Facts (D.E. 253-2 ("Pl.'s Response")); and Defendants' Response to Plaintiff's Counterstatement of Undisputed Material Facts (D.E. 262-5 ("Defs' Response")).

This Court summarized Plaintiff's factual allegations in its April 17, 2020 Letter Opinion partially granting and partially denying Defendants' Motion to Dismiss (D.E. 21 at 1–3) and in its July 29, 2021 Opinion denying Defendants' Motions for Judgment on the Pleadings (D.E. 85 at 1–6.) The parties are presumed to be familiar with this matter and this Court accordingly limits its discussion of the factual and procedural background to only the facts pertinent to the instant decision.

The following facts are undisputed. On June 10, 2013, Plaintiff went to the Woodbridge Township Police Department ("WPD") to report her Honda Civic as missing or stolen. (Defs' Statement ¶ 25; Pl.'s Response ¶ 25.) Plaintiff reported to WPD Officer Robert Barko ("Barko") that her live-in boyfriend, Jason Prontnicki ("Prontnicki"), had loaned the car to an individual named "Kareem Williams" without her consent. (Defs' Statement ¶ 28; Pl.'s Response ¶ 28.) Lieutenant James Mullarney ("Defendant Mullarney') attempted to identify and locate "Kareem Williams" to no avail. (Defs' Statement ¶¶ 32–33.) Thereafter, Defendant Mullarney ran Prontnicki's information through the DMV database and discovered that Prontnicki had two arrest warrants for armed robbery and a suspended license. (*Id.* at ¶¶ 34–35.)

Mullarney then informed Plaintiff of Prontnicki's outstanding warrants and told her that she should contact the WPD if she encountered Prontnicki. (Defs' Statement ¶ 36; Pl.'s Response ¶ 36.) Sergeant Walter Bukowski ("Defendant Bukowski") further added that as a New Jersey Superior Court Judge, Plaintiff had a duty to report Prontnicki's whereabouts. (Defs' Statement ¶ 37; Pl.'s Response ¶ 37.) Director Robert Hubner later assigned the Special Investigation Unit (SIU) and Lieutenant Brian Murphy ("Defendant Murphy") to effectuate the arrest of Prontnicki. (Defs' Statement ¶ 52; Pl.'s Response ¶ 52.)

2

After leaving the precinct, on June 10, 2013, at approximately 4:36 p.m., Plaintiff made a phone call to Bartko and left a voicemail message after Bartko failed to answer her phone call. (Pl.'s Counterstatement ¶ 33; Defs' Response ¶ 33.)  Plaintiff states that the voicemail message explained that Prontnicki had just left her property after returning her car and that Prontnicki was staying with his brother, Christopher Prontnicki, in Woodbridge.[2]  (Pl.'s Counterstatement ¶ 36.) Plaintiff further states that the voicemail message contained a description of Christopher's neighborhood in Woodbridge.  (*Id.*)  Plaintiff left her phone number and asked Bartko to return her call, however, no one from WPD returned her call.  (Pl.'s Counterstatement ¶¶ 37–38; Defs' Response ¶¶ 37–38.)

On June 11, 2013, the SIU began conducting surveillance of Plaintiff's home.  (Defs' Statement ¶ 60.)  That same day, at approximately 4:00 p.m., Murphy observed Prontnicki arrive at Plaintiff's home and enter the home through the garage.  (Defs' Statement ¶ 61; Pl.'s Response ¶ 61; Pl.'s Counterstatement ¶ 43.)  Prontnicki remained  inside Plaintiff's home for approximately one hour.  (Pl.'s Counterstatement ¶ 45.)  Plaintiff did not call WPD while Prontnicki was inside her home.  (Defs' Statement ¶ 70.)  However, at approximately 3:31 p.m., prior to Prontnicki's arrival at her home, Plaintiff made another call to Bartko and left another voicemail message after her call went unanswered.  (Pl.'s Counterstatement ¶ 33.)

While Prontnicki was inside Plaintiff's home, Defendant Murphy reviewed the criminal statutes for harboring and hindering the apprehension of a fugitive as he sat in his vehicle .  (Defs' Statement ¶ 62; Pl.'s Response ¶ 62.)  Defendant Murphy also attempted to call Assistant Prosecutor Cindy Glaser ("AP Glaser") to discuss probable cause to arrest Plaintiff.  (Defs'

---

[2] Plaintiff alleges that her voicemail messages were altered to exclude portions of her entire message. For purposes of this opinion, we accept Plaintiff's version of the content of her messages.

Statement ¶ 65.) After failing to reach AP Glaser, Defendant Murphy called Director Hubner who advised him that he would contact Middlesex County Prosecutor Andrew Carey ("Prosecutor Carey"). (*Id.* at ¶ 66.) Director Hubner then called Prosecutor Carey who advised Hubner that probable cause existed if Defendant Murphy believed that he had probable cause to arrest Plaintiff. (*Id.* at ¶ 71.) Prontnicki left Plaintiff's home at approximately at 4:55 p.m. and was later arrested. Shortly thereafter, Plaintiff was arrested on charges of harboring and hindering the apprehension of a fugitive Prontnicki in her home. (Defs' Statement ¶ 1; Pl.'s Response ¶ 1.)

After Plaintiff was arrested, AP Glaser advised Defendant Murphy that she would arrange for the officers to meet with a judge to review the Complaint-Warrants. (Defs' Statement ¶ 78; Pl.'s Response ¶ 78.) Later that evening, Defendants Murphy and Grogan met at the home of the Hon. Bradley Ferencz, the Presiding Criminal Judge of the Superior Court of Middlesex County, to review and consider the Complaint-Warrants charging Plaintiff with violating N.J.S.A. 2C:29-3, hindering the apprehension of another. (Defs' Statement ¶¶ 82–83.) Defendants Grogan and Murphy were placed under oath by Judge Ferencz and provided facts supporting the charges against Plaintiff. (Defs' Statement ¶ 84; Pl.'s Response ¶ 84.) Without playing the voicemail messages, Defendant Murphy advised Judge Ferencz that Plaintiff's voicemail messages contained no information regarding Prontnicki's whereabouts. Defs' Statement ¶¶ 90–92.)

The following day, the New Jersey Supreme Court suspended Plaintiff from her judicial duties without pay and referred the matter to the Advisory Committee on Judicial Conduct ("ACJC"). *See Matter of Brady*, 235 A.3d 175, 177 (N.J. 2020) (summarizing the procedural history of the criminal case). Subsequently, a grand jury indicted Plaintiff on three charges: second-degree official misconduct in violation of N.J.S.A. 2C:30-2(b), third-degree hindering

apprehension or prosecution in violation of N.J.S.A. 2C:29-3(a)(1), and third-degree hindering apprehension or prosecution in violation of N.J.S.A. 2C:29-3(a)(2). *Id.*

Plaintiff's criminal matter was handled by the Superior Court of New Jersey, Law Division, Somerset County. *Id.* On Plaintiff's motion, the Somerset County trial court dismissed the official misconduct charge, holding that Plaintiff had no duty clearly inherent in her judicial office to call and report Prontnicki's whereabouts. *See State v. Brady*, 172 A.3d 550, 558 (N.J. Super. Ct. App. Div. 2017) (summarizing the trial court's decision). On September 11, 2017, the Appellate Division affirmed the trial court's ruling, permitting only the two hindering charges to proceed, and remanding the matter for further proceedings. *See id.* at 568. The State then moved to dismiss with prejudice the remaining two counts of the indictment. *Matter of Brady*, 235 A.3d at 177. On March 2, 2018, the trial court granted that motion, thus concluding the criminal proceedings against Plaintiff. *Id.*

On March 6, 2018, the New Jersey Supreme Court reinstated Plaintiff to her duties as a Superior Court Judge. *Id.* Thereafter, on May 4, 2018, the ACJC filed a Complaint against Plaintiff regarding her actions on June 10 and 11, 2013, for violations of the Code of Judicial Conduct. *Id.* Following a seven-day hearing, the ACJC recommended Plaintiff's removal from the bench. *Id.* On August 6, 2020, the New Jersey Supreme Court issued a decision concurring with the ACJC's factual findings in part and ordering a three-month suspension from the bench. *See Id.* at 185, 192. Ultimately, Plaintiff's term as a Superior Court Judge expired and she was not reappointed to the bench.

## II. <u>PROCEDURAL HISTORY</u>

Plaintiff filed the instant suit on September 10, 2019 and filed her Amended Complaint one day later. (D.E. 1, 2.) The Amended Complaint consists of ten counts: Pattern and Practice

(Municipal and Governmental Liability) (Count I); Violations of 42 U.S.C. § 1983 for Malicious Prosecution (Count II); Violations of 42 U.S.C. § 1985 for Conspiracy (Count III); Violations of 42 U.S.C. § 1983 for Supervisory Liability - Negligent Training (Count IV); Violations of 42 U.S.C. § 1983 for Negligent Hiring/Retention (Count V); Violations of 42 U.S.C. § 1983 for Race/Gender Discrimination (Count VI); Violations of 42 U.S.C. § 1985(3) for Conspiracy with Racial Animus (Count VII); Negligent and Intentional Infliction of Emotional Distress (Count VIII); Violations of the New Jersey Civil Rights Act (Count IX); and Punitive Damages (Count X). Defendants subsequently moved to dismiss the Amended Complaint.

On April 17, 2020, this Court issued an opinion dismissing Counts I and III–IX as time-barred but allowed Plaintiff's claims for malicious prosecution and punitive damages to proceed. (D.E. 21 at 4–5.) Plaintiff subsequently filed a Motion for Reconsideration, and on August 19, 2020, this Court reinstated her dismissed claims "only to the extent that they are based on her underlying claim of malicious prosecution." (D.E. 39 at 3.) Defendants then filed a Motion for Judgment on the Pleadings, which this Court denied in its opinion issued on July 29, 2021. (D.E. 85.) Following that denial, Defendants moved for reconsideration, (D.E. 87–91) which was denied by way of this Court's opinion dated January 12, 2022., (D.E. 102.) Defendants now move for summary judgment. (D.E. 239–242.) All briefing was timely completed, and oral argument was held on October 9, 2025, wherein this Court reserved decision.

## III.   **LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no

*genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party makes this showing, the burden shifts to the nonmovant who "must set forth specific facts showing that there is a genuine issue for trial." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288–89 (3d Cir. 2018) (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)). Although courts view all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, the nonmoving party cannot simply rely on the "mere allegations or denials of his pleadings." *Id.* at 288. Similarly, "[b]are assertions, conclusory allegations, or suspicions will not suffice." *Id.* at 288–89 (quoting *Central Dauphin*, 765 F.3d at 268–69). If the nonmoving party fails to make an adequate showing, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

On summary judgment, the court may not make credibility determinations or weigh the evidence; instead, the nonmoving party's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam) (quoting *Anderson*, 477 U.S. at 255). "[T]he court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial

… constru[ing] the facts and inferences in the light most favorable to the non-moving party." *Capitalplus Equity, LLC v. Prismatic Dev. Corp.*, Civ. No. 07-321, 2008 WL 2783339 (D.N.J. July 16, 2008).

There is, however, "no issue for trial unless the nonmoving party can demonstrate that there is sufficient evidence favoring the nonmoving party so that a reasonable jury could return a verdict in that party's favor." *First Valley Leasing, Inc. v. Goushy*, 795 F. Supp. 693, 696 (D.N.J. 1992). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Am. Seating Co. v. Archer Plastics Inc.*, Civ. No. 11-53, 2012 WL 2937338, at *6 (D.N.J. July 18, 2012) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Self-serving, conclusory affidavits and testimony, when contradicted by other record evidence, are insufficient to create a genuine dispute of material fact. *Irving v. Chester Water Auth.*, 439 F. App'x 125, 127 (3d Cir. 2011) (finding "self-serving deposition testimony" which conflicted with deponent's "earlier testimony and … other record evidence … insufficient to raise a genuine issue of material fact"); *Marrin v. Cap. Health Sys., Inc.*, Civ. No. 14-2558, 2017 WL 2369910, at *17–20 (D.N.J. May 31, 2017) (granting summary judgment despite nonmovant's "conclusory" affidavit contradicted by record evidence).

## IV.  **DISCUSSION**

Defendants move for summary judgment as a matter of law asserting that Plaintiff's malicious prosecution claim must be dismissed because:  (1) Defendants Hubner and Murphy are entitled to the advice -of- counsel defense; (2) Defendants Grogan, Murphy, and Bukowski are entitled to absolute immunity; (3) Defendants are entitled to qualified immunity; (4) Plaintiff has

failed to establish cognizable *Monell* claims against Defendant Woodbridge; and (5) Plaintiff has failed to establish a claim for punitive damages.[3]

### i.    Advice of Counsel Defense for Hubner and Murphy

Defendants argue that all counts against Hubner and Murphy should be dismissed because they are entitled to the advice-of-counsel defense.  The Third Circuit has emphasized that the advice-of-counsel defense is only available after "full and honest disclosure of the material facts surrounding a possible course of action." *United States v. Traitz*, 871 F.2d 368, 382 (3d Cir. 1989). As a preliminary matter, this Court notes that it is unclear on what advice Defendants Hubner and Murphy relied  as the record demonstrates that AP Glaser and Prosecutor Carey merely rubber-stamped Defendant Murphy's finding of probable cause. Defendants submit that Prosecutor Carey now believes, after considering the evidence and testimony surrounding this matter, given his extensive background as both a federal and state Prosecutor, that the arrest of Plaintiff was justified. Such an argument is misplaced and not dispositive for this Court's consideration. Importantly, there are genuine issues of material fact as to the underlying questions regarding whether Defendant Murphy presented false or incomplete information to AP Glaser and Prosecutor Carey.  Accordingly, it is not appropriate for this Court to grant summary judgment for Defendants Hubner and Murphy based on the advice-of-counsel defense.

### ii.    Absolute Immunity for Defendants Grogan, Murphy, and Bukowski

---

[3] Defendants further assert that collateral estoppel bars Plaintiff's claims based on the New Jersey Supreme Court's factual findings in *In the Matter of Carlia Brady*, 243 N.J. 395 (2020).  However, this Court  already addressed this argument in its previous Opinion (D.E. 102), dated January 12, 2022, which stated that the New Jersey Supreme Court declined to make certain factual findings that are necessary to decide Plaintiff's claim for malicious prosecution.  As such, this Court declines to readdress Defendants' argument for collateral estoppel.

Defendants argue that all counts against Defendants Grogan, Murphy, and Bukowski should be dismissed because they are entitled to absolute immunity. Specifically, Defendants assert that Grogan and Bukowski are entitled to absolute immunity for their grand jury testimony; and Murphy and Grogan are entitled to absolute immunity for their sworn statements before Judge Ferencz. Relying on the Supreme Court's decision in *Malley v. Briggs*, 475 U.S. 335 (1986) Plaintiff counters that Grogan and Bukowski are not entitled to absolute immunity for their grand jury testimony because they provided false testimony as complaining witnesses seeking arrest warrants.

In *Rehberg*, the Supreme Court affirmatively held that a grand jury witness has absolute immunity from any § 1983 claim based on the witness' testimony. *Rehberg v. Paulk*, 566 U.S. 356, 369 (2012). The Court further emphasized that this rule may not be circumvented by claiming that "a grand jury witness conspired to present false testimony or by using evidence of the witness' testimony to support any other § 1983 claim concerning the initiation or maintenance of a prosecution." *Id.* Plaintiff's reliance on *Malley* is misplaced as the Supreme Court clarified in *Rehberg* that a law enforcement officer testifying before a grand jury is not comparable to a "complaining witness." *Rehberg*, 566 U.S. at 371 ("By testifying before a grand jury, a law enforcement officer does not perform the function of applying for an arrest warrant; nor does such an officer make the critical decision to initiate a prosecution."). Moreover, the Court also stressed that a complaining witness cannot be held liable for testimony before a grand jury. "[A] complaining witness cannot be held liable for perjurious trial testimony . . . [a]nd there is no more reason why a complaining witness should be subject to liability for testimony before a grand jury." *Id.* Accordingly, to the extent that Plaintiff's claims against Defendants Grogan and Bukowski are

based on their grand jury testimony, Grogan and Bukowski are protected by absolute immunity for testifying as a witness in a judicial proceeding.

Defendants also seek to extend absolute immunity to sworn testimony beyond judicial proceedings, stating that sworn statements in support of applications for arrest warrants are indistinguishable from grand jury and pretrial proceedings. However, the sworn statements at question are clearly distinguishable from grand jury and pretrial proceedings. As articulated by the Supreme Court in *Rehberg*, absolute immunity prevents the subversion of grand jury secrecy as the grand jury system depends upon the vital secrecy of grand jury proceedings. *See Rehberg*, 566 U.S. 356 at 374. Importantly, the Supreme Court dismissed a similar argument to Defendants' where the petitioner contended that sworn testimony for a criminal complaint is indistinguishable from grand jury testimony:

> Petitioner says there is no reason to distinguish between a person who goes to the police to swear out a criminal complaint and a person who testifies to facts before a grand jury for the same purpose and with the same effect . . . But this is like saying that a bicycle and an F–16 are the same thing. Even if the functions are similar as a general matter, the entities are quite different. Grand juries, by tradition, statute, and sometimes constitutional mandate, have a status and entitlement to information that absolute immunity furthers.

*Id.* at 372 n.3. Furthermore, as explained by the Third Circuit, the purpose of absolute immunity is to encourage complete disclosure in judicial proceedings. *Williams v. Hepting*, 844 F.2d 138, 142 (3d Cir. 1988). Witnesses are encouraged to tell all they know without fearing reprisal because the "tools of the judicial process—rules of evidence, cross-examination, the factfinder, and the penalty of perjury—will be able to uncover the truth." *Id.*

Here, Murphy and Grogan's statements to Judge Ferencz are clearly distinguishable from testimony before a grand jury and were not made during a judicial proceeding where the tools of

the judicial process were present to ferret out the truth.  Therefore, Grogan and Murphy are not protected by absolute immunity for their sworn statements before Judge Ferencz.  Accordingly, Defendants Grogan and Murphy are not entitled to summary judgment based on absolute immunity.

### iii.    Qualified Immunity

### a.    Qualified Immunity for Defendants Grogan and Murphy

"Police officers, embodying the authority of the state, are liable under [42 U.S.C.] § 1983 when they violate someone's constitutional rights, unless they are protected by qualified immunity." *El v. City of Pittsburgh*, 975 F.3d 327, 334 (3d Cir. 2020) (quoting *Curley v. Klem*, 499 F.3d 199, 206 (3d Cir. 2007)).  The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  The qualified immunity inquiry contains two prongs: (1) whether the facts alleged by the plaintiff show the violation of a constitutional right, and (2) whether the law was clearly established at the time of the violation. *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010).  An answer in the negative to either prong entitles an officer to qualified immunity.  *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021)

This Court will first address the "clearly established law" prong of the qualified immunity analysis.  *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Pearson*, 555 U.S. at 236 (affirming that courts have discretion to decide which of the two prongs to tackle first).  The "clearly established law" prong requires a two-part inquiry.  *Peroza-Benitez*, 994 F.3d at 165 (citing *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012)).  First, this Court must "define the right

allegedly violated at the appropriate level of specificity," and then consider whether that right was "clearly established" at the time of its alleged violation, i.e., whether the right was "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* Typically, analogous precedent from the Supreme Court or the Third Circuit or a consensus of persuasive authority in the Courts of Appeals is required. *Clark v. Coupe*, 55 F.4th 167, 182 (3d Cir. 2022); *Peroza-Benitez*, 994 F.3d at 165. There need not be an analogous case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate. *Rivera-Guadalupe v. City of Harrisburg*, 124 F.4th 295, 300 (3d Cir. 2024).

Viewing the facts in the light most favorable to Plaintiff, Defendants Grogan and Murphy violated Plaintiff's rights by arresting her without probable cause and fabricating evidence and omitting material facts to obtain the Complaint-Warrants.[4] At the time of Plaintiff's arrest it was clearly established that the Fourth Amendment prohibits a police officer from arresting a citizen without probable cause, *Rogers v. Powell*, 120 F.3d 446, 452 (3d Cir. 1997), and an officer cannot falsify an affidavit to obtain an arrest warrant or omit material facts necessary to a finding of probable cause, *Wilson v. Russo*, 212 F.3d 781, 786 (3d Cir. 2000). Accordingly, Defendants Grogan and Murphy do not satisfy this prong of the qualified immunity analysis.

Next, the "constitutional violation" prong of the qualified immunity analysis requires this Court to consider whether the facts, as viewed in the light most favorable to Plaintiff, show the violation of a constitutional right. *Peroza-Benitez*, 994 F.3d at 165. Although the question of qualified immunity is generally a question of law, "a genuine issue of material fact will preclude

---

[4] As discussed below, whether Defendants Grogan and Murphy fabricated evidence or withheld material facts when applying for the Complaint-Warrants is a question of fact for a jury to resolve. However, for the purposes of defining the right allegedly violated by Defendants, this Court views the facts favorably for Plaintiff.

summary judgment on qualified immunity." *Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir.2009); *see also Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002) (noting that "a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis.").

Here, Plaintiff alleges that Defendants Grogan and Murphy violated her constitutional right to be free from malicious prosecution by making false statements and withholding exculpatory evidence when applying for the Complaint-Warrants. Given the factual disparity concerning the contents of Plaintiff's voicemails, this Court cannot address the constitutional violation inquiry of the qualified immunity analysis. The finding of the constitutional violation at issue in this case hinges on which version of events is accepted by the jury. Should the jury find that Defendants Murphy and Grogan falsified evidence or omitted material facts that a judge would want to know, then the unlawfulness of their actions may be readily apparent to an objectively reasonable police officer.[5] Therefore, based on the record before this Court and in viewing the facts in the light most favorable to Plaintiff, there exist genuine disputes of material fact that preclude a finding of qualified immunity for Defendants Grogan and Murphy.

### b. Qualified Immunity for Defendants Bukowski, Mullarney, and Hubner

A plaintiff's failure to establish the violation of a statutory or constitutional right ends the qualified immunity analysis. *See Davila v. City of Camden*, 66 F. Supp. 3d 529, 534 n.3 (D.N.J.

---

[5] In determining whether a police officer had probable cause to arrest, as would support the officer's qualified immunity claim at the summary judgment stage in an action for false arrest and malicious prosecution, this Court must consider whether misrepresentations and reckless omissions in the officer's affidavit used to obtain an arrest warrant, considered in the context of the affidavit as a whole, were material or necessary to the finding of probable cause. *See Andrews v. Scuilli*, 853 F.3d 690, 697 (3d Cir. 2017). A police officer's omissions of information in applying for an arrest warrant are made with "reckless disregard," as would support a finding that the officer lacked probable cause to arrest, where an officer withholds a fact in his ken that any reasonable person would have known was the kind of thing the judge would wish to know. *Id.* at 698.

2014) ("Because the Court finds that plaintiff cannot support a claim that defendants violated his constitutional rights, the qualified immunity analysis ends there."); *see also Fraternal Ord. of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 247 (3d Cir. 2016) (agreeing "with the district court's conclusion that qualified immunity depends, in part, on whether a legal violation occurred" and that because "[p]laintiffs have not shown a violation of federal law, [the court] need not reach the issue of qualified immunity").

Here, considering the factual record and drawing all justifiable inferences in Plaintiff's favor, this Court finds that Plaintiff has failed to show that Defendants Bukowski and Mullarney violated § 1983 or otherwise violated a clearly established statutory or constitutional right belonging to Plaintiff.  Defendants Bukowski and Mullarney erroneously told Plaintiff that she had a judicial duty to notify police about Prontnicki's whereabouts.  However, Defendants Bukowski and Mullarney's mistaken assertion, by itself, does not rise to the level of a constitutional violation as it was based on a reasonable mistaken interpretation of the law.  *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009) ("The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.") (internal citation omitted).  Moreover, even if their conduct did amount to a constitutional violation, Defendants Bukowski and Mullarney are still entitled to qualified immunity because it was not clearly established at the time that Plaintiff, as a judge, did not have a duty to inform police about Prontnicki's whereabouts.  *See State v. Brady*, 172 A.3d 550, 558 (N.J. Super. Ct. App. Div. 2017) (affirming lower court's ruling that Plaintiff had no duty clearly inherent in her judicial office to call and report Prontnicki's whereabouts).

Likewise, Defendant Hubner is entitled to qualified immunity as Plaintiff's allegations and the factual record fail to show the violation of a constitutional right.  Based on the information

provided to him by Defendant Murphy and Prosecutor Carey, Defendant Hubner advised Defendant Murphy that probable cause existed to arrest Plaintiff. Defendant Hubner played no further role in the prosecution of Plaintiff. Defendant Hubner's conduct, even when viewed in the light most favorable to Plaintiff, does not demonstrate a violation of Plaintiff's constitutional rights. Accordingly, Defendants Bukowski, Mullarney, and Hubner are entitled to summary judgment based on qualified immunity for Plaintiff's malicious prosecution claims.[6]

### iv.    Claims Against Defendant Woodbridge

Plaintiff's Amended Complaint asserts a *Monell* claim against Defendant Woodbridge. (Am. Compl., D.E. 2 ("AC") Count I ¶¶ 1–42.; Count IV ¶¶ 1–6; Count V ¶¶ 1–12.) The Amended Complaint alleges that Defendant Woodbridge, through the WPD, "developed, implemented, enforced, encouraged and sanctioned a de facto policy, practice and/or custom of falsely arresting, racially profiling, maliciously prosecuting and engaging in the use of illegal and excessive force on citizens and cover-ups of these incidents," in addition to claims based on negligent training and negligent hiring and retention. (*Id.*) Specifically, Plaintiff alleges instances where judges found there was no probable cause for the arrest and/or prosecution of the citizens involved, and that Defendants either filed false reports or testified falsely. (*Id*). Defendants counter that Plaintiff's *Monell* claim against Defendant Woodbridge must be dismissed because Plaintiff has failed to demonstrate a constitutional violation and establish the existence of an unconstitutional policy or custom causing any alleged constitutional injury.

---

[6] Plaintiff also asserts a claim of supervisor liability against Defendants Bukowski and Hubner (AC, Count IV ¶¶ 1–6 ). However, Defendants Bukowski and Hubner are entitled to qualified immunity and accordingly, Count IV of Plaintiff's Amended Complaint is dismissed as to these Defendants.

It is well established that a municipality may only be liable under § 1983 where a constitutional injury is alleged to have been caused by a municipal "policy" or "custom." *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). As to policy, municipalities are liable where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated" by the body's officers. *Id.* at 690. As to custom, municipalities may be sued for "constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." *Id.* at 690–91.

Liability based on a custom rather than a formal adopted policy proceeds on the theory that the relevant practice is so widespread as to have the force of law. *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 404 (1997). One such custom is "deliberate indifference" toward the class of persons who might suffer a constitutional injury as a result of the conduct in question. *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1070 (3d Cir.1991). Custom may also be established by proof of knowledge and acquiescence. *Fletcher v. O'Donnell*, 867 F.2d 791, 793 (3d Cir. 1989). Even if a municipality's policy or custom is "not unconstitutional itself," *Monell* liability may still be established "when the policy or custom ... is the 'moving force' behind the constitutional tort of one of the municipality's employees." *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1027 (3d Cir. 1991) (quoting *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981)). To establish the necessary causation, a plaintiff must demonstrate a "plausible nexus" or "affirmative link" between the municipality's custom and the specific deprivation of constitutional rights at issue. *See Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990) (internal citation omitted). However, "[a]s long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." *Id.*

As discussed above, the constitutional violation alleged in this matter must be considered by a jury.  However, for the sake of completeness, assuming *arguendo* a constitutional violation exists , this Court will address whether Plaintiff has demonstrated a custom that caused her alleged injury.[7]  In support of Plaintiff's assertion of Defendant Woodbridge's longstanding custom of inadequate supervision, training, and misconduct investigations, Plaintiff relies on the expert report of police veteran, Joseph Blaettler.

As an expert witness, Blaettler, identifies several alleged procedural deficiencies and concludes that the WPD's review was more interested in protecting its officers instead of adequately investigating complaints.  (*See* D.E. 254-9, at 35–36.)  Blaettler further opines  that Defendant Woodbridge knew  their officers were alleged to have been less than credible, resulting in criminal charges being dismissed and evidence suppressed, and did nothing to investigate these matters and take appropriate action.  (*Id.* at 54.)  Plaintiff alleges that these procedural deficiencies constituted a municipal custom or practice that contributed to her injury.  However, Blaettler's expert report does not present sufficient evidence from which a reasonable jury could infer that Defendant Woodbridge knew about and acquiesced in a custom of tolerating dishonesty from its officers.  For instance, Blaettler identifies eighteen (18) Internal Affairs (IA) matters involving Defendant Bukowski that he determines fail to meet the standards of the New Jersey Attorney General ("NJAG") IA guidelines.  (*See* D.E. 254-9, at 39–45.)  However, of the eighteen matters, only one involved dishonesty and Blaettler concludes that the investigation of that matter was conducted within the NJAG IA guidelines.  (*Id.* at 45.)  Next, Blaettler reviews five (5) IA files involving allegations of false arrest, none of which involved Defendants and all of which occurred

---

[7] Although Plaintiff alleges both a policy and custom, in her response to Defendants' Motion for Summary Judgment, Plaintiff only argues the existence of a custom not policy.

five to seven years before Plaintiff's arrest. (*Id.* at 46–48.) Blaettler only identifies a single complaint against Defendant Murphy for false arrest, which occurred <u>after</u> Plaintiff's arrest.

To the extent that Plaintiff relies on *Beck v. City of Pittsburgh*, 89 F.3d 966 (3d Cir. 1996), the record before this Court is not like the wealth of information provided by the plaintiff in *Beck*. In *Beck*, the plaintiff produced evidence that the individual officer who had allegedly used excessive force against him had five prior complaints filed against him within a period of five years for similar conduct. 89 F.3d at 973. The plaintiff in Beck also presented annual departmental reports detailing the high rate of excessive force incidents. *Id*. Unlike *Beck*, Blaettler's more detailed explanations of the allegedly flawed IA process do not focus on similar conduct to that alleged by Plaintiff, nor do the complaints involve Defendants. In fact, the sum of Blaettler's expert report focuses on the arrest of Plaintiff and the subsequent IA investigation of Defendant Murphy rather than previous complaints of similar conduct.

Here, even when viewing the facts in the light most favorable to Plaintiff, Plaintiff has failed to state a plausible claim that the customs of the WPD, specifically their alleged failure to adequately investigate and/or discipline officers for false testimony and falsified reports, may have caused Defendants to arrest her without probable cause. Accordingly, Plaintiff's *Monell* claim, alleging a custom or practice of inadequate misconduct investigations is unsupported and shall not proceed to a jury.[8] As a result, summary judgment as to Plaintiff's *Monell* claim against Defendant Woodbridge is granted.

---

[8] Likewise, to the extent that Plaintiff's *Monell* claim alleges a policy or custom of racial profiling and excessive force, such claim cannot proceed. Plaintiff has failed to provide any proof that she suffered a constitutional injury stemming from a policy or custom of racial profiling and excessive force, nor does Plaintiff argue the same in her response to Defendants' Motions for Summary Judgment.

Plaintiff's *Monell* claims based on negligent training and negligent hiring and retention are also deficient.  (AC Count IV ¶¶ 1–6; and Count V ¶¶ 1–12.)  Where the policy or custom "concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact."  *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)).  Likewise, to succeed on a negligent hiring theory under *Monell*, a plaintiff must show that the hiring decision "reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow."  *Kobrick v. Stevens*, 763 F. App'x 216, 221 (3d Cir. 2019) (internal citation omitted).

"Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 223 (3d Cir. 2014) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997)).  Ordinarily, for negligent training claims, "a pattern of similar constitutional violations by untrained employees" is necessary "to demonstrate deliberate indifference for purposes of failure to train."  *Id.* (internal citation omitted).  In addition to deliberate indifference, there must also be a causal nexus between the identified deficiency in training and the alleged constitutional injury.  *Id.* at 226 (citing *Canton*, 489 U.S. at 391).  For negligent hiring claims, an official is deliberately indifferent only when "adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right."  *Kobrick*, 763 F. App'x at 221.

Here, Blaettler's expert report does not even touch upon negligent training or negligent hiring and retention.  As such, Plaintiff has produced no evidence identifying deficient training

20

programs or demonstrating deliberate indifference for purposes of failure to train nor under the negligent hiring theory.  Therefore, Defendant Woodbridge is also entitled to summary judgment on Plaintiff's *Monell* claims based on negligent training and negligent hiring and retention.

### v.    Punitive Damages

Defendants argue that they are entitled to summary judgment on Plaintiffs' request for punitive damages.[9] To recover an award of punitive damages in an action under § 1983, Plaintiff must show that Defendants' conduct was motivated by evil motive or intent, or it involved reckless or callous indifference to the federally protected rights of others.  *See Smith v. Wade*, 461 U.S. 30, 56 (1983); s*ee also Jackson v. Gandy*, 877 F. Supp. 2d 159, 173 (D.N.J. 2012) (internal citations omitted). To recover punitive damages, Defendants' actions need not "meet the higher standard of an intentional or evil motive," rather Defendant's conduct must be, "at a minimum, reckless or callous."  *Gandy*, 877 F. Supp. at 173 (citing *Savarese v. Agriss*, 883 F.2d 1194, 1204 (3d Cir. 1989)).

Here, the question of whether Defendants acted with evil motive or intent, or with reckless or callous indifference to Plaintiff's federally protected rights is better answered by a jury as genuine issues of material fact exist.  *See Id.* (denying summary judgment on punitive damages due to material issues of fact); *see also Kounelis v. Sherrer*, 529 F. Supp. 2d 503, 534 (D.N.J. 2008) (same); and *Kleinberg v. Clements*, No. 09-4924 NLH, 2012 WL 1019290, at *9 (D.N.J. Mar. 23, 2012) (same).  As stated above, in viewing the facts in the light most favorable to Plaintiff, a jury could find that Defendant Grogan and Murphy arrested Plaintiff without probable cause and withheld material exculpatory facts when applying for the Complaint-Warrants.  Thus, depending

---

[9] Plaintiff has voluntarily dismissed her claims for punitive damages against Defendants Bukowski, Mullarney, and Hubner.  (*See* D.E. 243 and D.E. 281.)  Only her claims for punitive damages against Defendants Grogan and Murphy remain.

on whose story the jury credits and its factual determinations, a jury may appropriately award punitive damages if the jury finds for Plaintiff. *See Kleinberg*, 2012 WL 1019290 at *9 (stating that even without evidence demonstrating malice or evil intent, officers are presumed to know the law and that arrests without probable cause violate the Constitution so that a jury could award punitive damages) (citing *Savarese*, 883 F.2d at 1204 n. 14). Accordingly, Defendants Grogan and Murphy's Motion for Summary Judgment as to Plaintiff's request for punitive damages is denied.

### vi.    Plaintiff's Remaining Claims

Lastly, in its Opinion dated August 19, 2020, this Court reinstated Plaintiff's dismissed claims, Counts III–IX of her Amended Complaint, "only to the extent that they are based on her underlying claim of malicious prosecution." (D.E. 39 at 3.) Here, Counts VI and VII of Plaintiff's Amended Complaint must be dismissed as Plaintiff has failed to provide any evidence of race and/or gender discrimination, or a conspiracy based on racial animus. In fact, except for a dismissed party, none of the Defendants were questioned about Plaintiff's race or gender during depositions. (*See* D.E. 253-7; 253-8; 254-1; 254-2; 254-3; 254-4; 254-5.) Further, Blaettler's expert report identifies one instance of an WPD officer making derogatory comments about African Americans, however this instance did not involve any of the Defendants. (D.E. 254-9 at 48.) As Plaintiff's underlying malicious prosecution claim will proceed due to genuine issues of material fact, Counts III, VIII, and IX against Defendants Grogan and Murphy will also proceed to a jury.

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, Defendants' Motions for Summary Judgment are **DENIED in part and GRANTED** as to Plaintiff's claims against Defendants Bukowski, Mullarney, Hubner, and Woodbridge. Plaintiff's malicious prosecution claim (Count II) and her remaining

claims in Counts III, VIII, IX, and X of her Amended Complaint will proceed to trial against

Defendants Grogan and Murphy only.  An appropriate order follows.

/s/ *Susan D. Wigenton*
**SUSAN D. WIGENTON, U.S.D.J.**

Orig:   Clerk
cc:     Leda D. Wettre, U.S.M.J.
        Parties